# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Physeon GmbH,

         Plaintiff,

vs.

Covance Inc.,

         Defendant.

Case No._____

**COMPLAINT**

Plaintiff Physeon GmbH, ("Physeon") for its Complaint against Defendant Covance Inc., the surviving corporation in its merger with Regulatory & Clinical Research Institute, Inc. which became effective on December 31, 2019 (collectively hereinafter referred to as "RCRI"), states and alleges as follows:

## NATURE OF THE ACTION

1.    This matter arises out of RCRI's failure to properly manage and oversee a critically important clinical trial for a new medical device, Veinplicity®. Veinplicity® was developed by Physeon to safely increase blood flow and stabilize peripheral veins in the forearm to improve the rate of successful venipuncture and cannulation in patients. Physeon entrusted RCRI with this clinical trial, which was crucial to Veinplicity® gaining marketing approval in the United States from the United States Food and Drug Administration ("FDA"). Physeon contracted with RCRI because RCRI touted itself as being an expert and "leading clinical research organization" that could help design, administer, manage, and analyze clinical trials and clinical trial results to maximize the chances of regulatory approval.

2.      RCRI agreed to ensure that the clinical trial of Veinplicity® would comply with, among other standards, ethical and quality standards, U.S. regulations governing the conduct of clinical trials, and the specific protocol and related procedures that it prepared for the Veinplicity® clinical trial.  RCRI knew that adherence to these standards and the protocol was of critical importance not only to meet its own contractual duties to Physeon, but also to meet the standards of the regulatory authorities (namely, the FDA) and the ethical and protocol controls enforced by the clinical sites' Institutional Review Boards ("IRBs").  RCRI, however, completely failed to perform its obligations in accordance with its agreement with Physeon and the applicable regulatory, industry and ethical standards. In fact, RCRI completely failed in its obligation to monitor and supervise the clinical sites to ensure protocol compliance and accurate data collection.  In so doing, RCRI undermined the validity of the clinical trial – rendering it worthless – which resulted in the Veinplicity® trial incorrectly and prematurely being deemed a failure.  Because RCRI failed to ascertain the reason for the failure (i.e. that clinicians were not following the written protocol for the study) and never reported non-compliance with the protocol to Physeon, Physeon and RCRI prematurely stopped the trial and closed clinical sites, likely preventing Physeon from being able to obtain marketing authorization for Veinplicity® in the United States. Physeon brings this action to recover damages and other relief as a result of RCRI's breach of the parties' agreement, its improper and deceptive acts, and breach of its express and implicit obligations to regulatory authorities, the IRBs, and the patients.

4840-2023-4167

## The Parties

3.      Plaintiff Physeon is a corporation organized and existing under the laws of Switzerland, with its principal place of business in Schaffhausen, Switzerland.  Plaintiff has operations in the United States, including in the State of Minnesota.

4.      Defendant Covance Inc. is a Delaware corporation with its principal place of business and executive offices at 210 Carnegie Cir., Princeton, New Jersey 08540. Covance Inc. maintains an address in Minnesota at 2345 Rice Street, Suite 230, Roseville, MN 55113.

5.      Defendant Covance Inc. merged with Regulatory & Clinical Research Institute, Inc. on or about December 31, 2019 with Covance Inc. continuing as the surviving corporation and legal successor in interest.  Prior to the merger, Regulatory & Clinical Research Institute, Inc. was a Minnesota corporation with its principal place of business at 5353 Wayzata Boulevard, Suite 505, Minneapolis, Minnesota 55416.   On information and belief, Covance Inc. continues to operate Regulatory & Clinical Research Institute from this address (*See* https://www.rcri-inc.com/).

## Jurisdiction and Venue

6.      On or about March 19, 2018, Physeon entered into the Master Services Agreement ("MSA") with RCRI, pursuant to which RCRI agreed to provide regulatory, health economics and clinical trial consulting and management services to Physeon and to manage the clinical trial set forth in the study protocol ("Protocol") (and incorporated into

3

the MSA) of its Veinplicity® device that ultimately was conducted at clinic sites in Minnesota. *See* MSA attached as Exhibit "1" and Protocol attached as Exhibit "2."

7.     This Court has jurisdiction under 28 U.S.C. § 1332 in that the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00. Defendant Covance Inc. is a citizen of Delaware and New Jersey for diversity purposes, and Plaintiff is a citizen of Switzerland.

8.     Venue is proper in this federal district pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

9.     The MSA further provides that it shall be governed by and construed in accordance with the laws of Minnesota.

## FACTUAL ALLEGATIONS

### A.     Physeon and Its Veinplicity® Device

10.     Physeon is a medical device company that was established in 2015 to develop and commercialize new innovations in the healthcare industry. Physeon's flagship product is the Veinplicity® device.

11.     Veinplicity® is an innovative, electrical stimulation device that may be used in adjunct to venipuncture or venous cannulation. Venipuncture is the common procedure of inserting a needle into a vein to draw blood or administer medications. Venous cannulation is the insertion of a temporary indwelling catheter or tube into that vein following such venipuncture to administer fluids or medications on a longer-term basis (hereinafter, "cannulation").

4

4840-2023-4167

12.     Veinplicity® is attached to the forearm via a disposable electrode and emits a gentle  electrical current with a specific wave form.  Stimulation of the nerves and muscles in the forearm result in increased blood flow and vasodilation, while stimulation of receptors in the vessel wall causes veins to stiffen.  Enlarged veins are pushed towards the surface where they are easier to identify and palpate, better anchored and less prone to rolling.  This enhances the ability of medical professionals to cannulate forearm veins on the first attempt, which is generally termed "first-stick."

13.     Physeon had earlier conducted a clinical trial study in the Netherlands, the results of which were published on March 28, 2019, in the Journal of Vascular Access. The clinical study, authored by Fredericus Loon, et al, titled *Clinical Use of Electrical Stimulation with the Veinplicity® Device and its Effect on the First Attempt Success Rate of Peripheral Intravenous Cannulation: A Non-randomized Clinical Trial*, demonstrated an overall first-stick or first attempt success rate of 92% using Veinplicity® plus tourniquet for cannulation, as compared with a first-stick success rate of 78% in the control group (tourniquet only). (https://www.ncbi.nlm.nih.gov/pubmed/30919735).

14.     Following the success of its Netherlands clinical trial study, in advance of coming to market in the United States and in order to gain FDA marketing authorization for Veinplicity® as a Class II medical device, Physeon sought to conduct a clinical trial study in the United States to further demonstrate the device's safety and efficacy to the FDA.

15.     Physeon and RCRI on its behalf held meetings with FDA to design a suitable protocol.  FDA advised Physeon and RCRI that the Protocol eventually implemented

would support marketing authorization if conducted in accordance with regulations and ethical standards and if the results in terms of safety and first-stick success were comparable to the study in the Netherlands.

**B.**   **RCRI Markets and Holds Itself Out As Being A Leading Clinical Research Organization**

16.   RCRI promotes and holds itself out as being a "leading clinical research organization, medical device consulting firm, and strategic regulatory expert." (website page: https://www.rcri-inc.com/).

17.   In doing so, RCRI promotes its clinical research organization ("CRO") services as being committed to the "highest standards of professional excellence in CRO research and clinical trials." (website page: https://www.rcri-inc.com/clinical-research/).

18.   In fact, RCRI acknowledges that the "success of a clinical trial" requires a "focus on flawless execution," and represents to the public that its ability to provide "flawless execution" of clinic trial protocols is the reason why "[its] studies generate compelling evidence." (*Id.*)

19.   RCRI further represents, promotes, and markets its ability during clinical trials to "quickly pinpoint areas for improvement or efficiency, [and] identify unusual findings in the data," which allows its clients to obtain clinical evidence in support of their medical products.  (*Id.*)  Unlike drug trials, studies of medical devices are not generally blinded, which permits, real-time analysis of study management, study data, and any other implementation issues that might otherwise bar such "flawless execution."

20.     RCRI further lists its capabilities as including clinical study operations, site management and site monitoring services, and regulatory and ethical compliance, monitoring of clinical study sites and auditing.  (*Id.*)

21.     RCRI also directly promoted its experience to Physeon.  RCRI represented to Physeon that it was one of only a few ISO 9001:2008 certified medical device CROs in the world and that its established "quality system" would ensure any clinical trial carried out for Physeon would be done using "well-proven processes."

22.     RCRI represented to Physeon that it had a "significant and proven track record in the neuromodulation and venous areas," and that it had engaged in hundreds of clinical trials across a wide range of therapeutic areas, including medical technology and novel therapies.  RCRI also represented that its consultants specialize in medical device studies.

23.     In addition, RCRI represented that its relationships with clinical sites, based on their long history and experience, would enable RCRI to identify and enlist clinical sites qualified to perform Physeon's study rapidly and efficiently.

**C.     Physeon Hires RCRI To Conduct Its "VIVA" Clinical Trial Study**

24.     Based on RCRI's representations to Physeon regarding its CRO capabilities and expertise, including that it could flawlessly execute clinical trial protocols and manage and monitor clinical trial sites for compliance with regulations and protocols, Physeon entered a written contract with RCRI to conduct a clinical trial study in the United States with respect to Veinplicity®.

25.     On or about March 18, 2018, Physeon and RCRI entered into the MSA pursuant to which RCRI was to perform consulting services for Physeon and run its clinical trial study, pursuant to the written Protocol it developed with input from Physeon entitled the "Veinplicity® for Improved Venous Access" Study, aka the "VIVA Study."

26.     RCRI agreed to ensure that the VIVA Study would comply with, among other standards, applicable FDA regulations, local IRB requirements, the approved informed consent, and its own guidelines and standard operating procedures.  RCRI knew that adherence to these standards was critical to both its contractual duties to Physeon under the MSA, but also to the public interest in the conduct of ethical medical research, and to meet the standards of the FDA which would eventually audit the clinical sites and evaluate the conduct of the study before accepting the study results.

27.     The well-understood content of the obligations to which RCRI committed (e.g., monitoring, compliance with regulations governing the conduct of clinical trials, compliance with the Protocol) are set forth in detail in numerous regulations promulgated by FDA, guidance issued by FDA, guidelines of the International Conference on Harmonization adopted by FDA, and in a number of FDA websites (*see*, *e.g.*, https://www.fda.gov/medical-devices/overview-device-regulation/bioresearch-monitoring.  These regulations and guidance are amenable to construction by the court of the terms of the agreement.  These numerous resources are intended to assure that to the extent feasible study data are collected per the Protocol, that failure to collect data properly are corrected immediately, to assure the safety of enrolled patients and the corresponding

8

risk-benefit approved by the local IRB, and, overall to assure the quality and integrity of the data to be submitted to FDA.

28.     As part of the MSA, RCRI again represented to Physeon that it is in the business of assisting medical device manufacturers with submissions to domestic and overseas regulatory agencies, clinical trial design, regulatory compliance, management and analysis of data from clinical trials, preclinical study design, having technical procedures and standards for conducting, managing, monitoring, auditing, and identifying and correcting issues during the conduct of the study (commonly identified as "quality systems") and compliance, health economics and outcomes research, and continuing education and training.

29.     The MSA required RCRI to provide to Physeon services as set forth in Work Orders that were to be entered into by and between Physeon and RCRI.

30.     On or about March 26, 2018, Physeon and RCRI executed a Work Order pursuant to which RCRI was to provide "Regulatory, Health Economics, and Clinical Trial consulting support to Physeon GmbH as detailed in the Preliminary Project Estimate titled Integrated Solution for Regulation, Health Economics & Clinical Trial Support for the Veinplicity® Device" project (the "Estimate").  *See* Work Order attached as Exhibit "3."

31.     The Estimate included fees for the entire trial of $310,982.00 for Clinical Trial Support and pass-through costs of $53,922.00 for a total of $364,904.00. Additionally, Regulatory Support fees were estimated at between $20,590 and $27,910.

32.     The Clinical Trial Support tasks listed in the Work Order included study initiation, site activation, site management and monitoring, data management, data

9

analysis, clinical reports, and project management and communication tasks.  The Work Order and the Estimate budgeted $56,509.00 for site management and monitoring, among other costs.  Up to the point where the study was terminated, invoices from RCRI totaled $563,150.96, of which Physeon has paid $473,702.05.

33.     Critically, the Estimate prepared for Physeon by RCRI was based on specific assumptions in regard to each parties' roles and responsibilities with respect to the VIVA Study.

34.     RCRI's assumptions in preparing the Estimate were that it would be responsible for nearly all facets of the VIVA Study itself, including all elements of the Study Initiation, Site Activation, Site Management and Monitoring, Data Management and Data Analysis phases.

35.     While Physeon was to review portions of the Study Initiation, RCRI was responsible for project start-up and team training, and preparing site training materials, among other responsibilities.

36.     RCRI was also solely responsible for the Site Activation phase of the clinical study.  RCRI was responsible for investigational site identification, investigational site qualification, investigational site selection, protocol training, budget and clinical trial agreement negotiations, and site set-up support, among other responsibilities, for the VIVA Study.

37.     RCRI was also solely responsible for the monitoring plan and training, statistical data plan, site initiation visits, interim monitoring visits, study close-out visits, and investigation site management and communication as part of the Site Management and

Monitoring portion of the VIVA Study.  RCRI was to make four physical or on-site visits to each clinical site during the study for purposes of monitoring and assuring compliance as an adjunct to site communications or monitoring that might take place via other means, such as phone calls or electronic communications or record-keeping.

38.     Similar to its responsibility of activating and monitoring the VIVA Study sites, RCRI was also responsible for collecting and managing the clinical data and analyzing it.

39.     In fact, RCRI was responsible for creating the data capture systems for the collection of clinical data resulting from the VIVA Study.  RCRI was to prepare the case report forms, which documents are required by FDA to ensure data quality and integrity, and on which the study sites and clinicians would record study data for each patient.

40.     In addition, RCRI was responsible for coordinating and preparing training materials and conducting any necessary training sessions to ensure each clinical site conducted the study in accordance with the Protocol, the informed consent, and the ethical requirements of the institution, and that its clinicians properly enrolled only patents eligible for the study, exposed such patients only to the risks contemplated by the Protocol specified procedures, and its clinicians accurately collected and recorded all VIVA Study data.

41.     The data management plan for the VIVA Study, and any associated training with respect to data management, was also RCRI's responsibility.

42.     In addition to Data Management, RCRI was responsible for the Data Analysis phase of the VIVA Study.  This included preparing the statistical analysis plan

11

for the VIVA Study, and conducting the Protocol-specified interim statistical analysis and validation, and ultimately the final statistical analysis.

43.    The following table outlines the roles that RCRI and Physeon were to perform with respect to the VIVA Study and the assumptions that RCRI made with respect to the responsibilities of the VIVA study, and relied on in preparing its Estimate, which it ultimately used to invoice Physeon:

## Clinical Study Roles and Responsibilities

The following table outlines the assumptions regarding the roles and responsibilities for the clinical study. These assumed assignments have contributed to the preliminary estimate.

X=Responsible     R=Review     A=Approve     N/A=Not Applicable

| RESPONSIBILITY | | STUDY INITIATION |
|---|---|---|
| Physeon | RCRI | |
| X | X | Project Start-up and Team Training |
| R | X | Clinical Protocol |
| R | X | Informed Consent Form Template |
| R | X | Nondisclosure Agreement Template |
| R | X | Budget and Clinical Trial Agreement Template |
| R | X | Site Training Materials |
| N/A | N/A | Investigator Meeting |
| N/A | N/A | Subject Recruitment Tools/Materials |
| **RESPONSIBILITY** | | **SITE ACTIVATION** |
| Physeon | RCRI | |
| | X | Investigational Site Identification |
| | X | Nondisclosure Agreement Negotiation |
| | X | Investigational Site Qualification |
| X | X | Investigational Site Selection |
| | x | Budget and Clinical Trial Agreement Negotiation |
| | X | Informed Consent Form Negotiation |
| | X | Site Set-up Support |
| | x | Regulatory Binder Assembly and Distribution to Site & Sponsor |
| **RESPONSIBILITY** | | **SITE MANAGEMENT & MONITORING** |
| Physeon | RCRI | |
| R | X | Monitoring Plan and Training |
| | X | Site Initiation Visits |
| | X | Interim Monitoring Visits |
| | X | Study Close Out Visits |
| | x | Investigational Site Management and Communication |
| N/A | N/A | Electronic Trial Master File (Regulatory Binder) |
| X [payments] | X [reports] | Site Payments |
| **RESPONSIBILITY** | | **DATA MANAGEMENT (with EDC)** |
| Physeon | RCRI | |
| R | X | Case Report Form Content |
| R | X | System Edit Check Specifications |
| | X | Database Development and Validation |
| X | X | User Acceptance Testing |
| | X | EDC Training Materials |
| | X | EDC Training Sessions |
| | x | Database Hosting/Usage, Help Desk and Support |
| | X | Database Maintenance and Support |
| | x | Database Lock(s), Data Transfer(s), and Archive |
| X | X | Client Communication/Meetings Regarding Study Database |
| R | X | Data Management Plan and Training |
| | X | Ongoing Data Review & Query Management |
| N/A | N/A | Medical Coding |

| RESPONSIBILITY | | SAFETY MANAGEMENT |
|---|---|---|
| Physeon | RCRI | |
| N/A | N/A | Safety Management Plan and Training |
| N/A | N/A | Safety Management Tasks |
| **RESPONSIBILITY** | | **DATA ANALYSIS** |
| Physeon | RCRI | |
| X | | Sample Size Calculation |
| | X | Randomization Schedule |
| | X | Statistical Analysis Plan |
| | X | Statistical Report Shell |
| | X | Statistical Code Development & Validation |
| N/A | N/A | Annual Statistical Analysis & Validation |
| | X | Interim Statistical Analysis & Validation |
| | X | Final Statistical Analysis & Validation |
| X | X | Client Communication/Meetings Regarding Data Analysis |
| **RESPONSIBILITY** | | **CLINICAL REPORTS** |
| Physeon | RCRI | |
| N/A | N/A | Annual Clinical Report Development & Validation |
| N/A | N/A | Interim Clinical Report Development & Validation |
| R | X | Final Clinical Report Development & Validation |
| X | X | Client Communication/Meetings Regarding Clinical Reports |
| **RESPONSIBILITY** | | **PROJECT MANAGEMENT & COMMUNICATION** |
| Physeon | RCRI | |
| X | X | Project Team Meetings with Client |
| X | X | Project Management and Client Communication |
| | X | RCRI (CRO) Internal Team Meetings |
| | X | Project Files Transfer and Archive |
| N/A | | CLINICAL EVENTS COMMITTEE (CEC) |
| N/A | | DATA SAFETY MONITORING BOARD (DSMB) |
| N/A | | CORE LABORATORY |
| N/A | | INVESTIGATOR MEETING PLANNER |
| N/A | | PUBLICATION PLANNING &SUPPORT |
| N/A | | AUDITS |

44.    As a result, RCRI and Physeon both understood their roles and responsibilities associated with the VIVA Study.  In addition, Physeon and Mary Kay Sobcinski, Senior Principal Advisor-Clinic Studies, of RCRI, held weekly, Monday conference calls throughout the duration of the study.  Physeon and RCRI regularly discussed the parties' respective clinical study roles and responsibilities during these calls,

which were at all times consistent with the Estimate assumptions above.  These conference calls also provided RCRI with the opportunity to report any adverse events or any violations of the Protocol that occurred at the three clinical sites, to Physeon.  At no time during those calls did RCRI report that there were any issues with Protocol compliance at any of the study sites.

45.    The Work Order and the Estimate also included services for FDA Pre-Submission Preparation and for a Pre-Submission Teleconference.

46.    Prior to Physeon's scheduled pre-submission meeting with the FDA on September 4, 2018, Rachel Kennedy, Senior Principal Advisor-Regulatory, and Mary Kay Sobcinski, both of RCRI, provided regulatory support to Physeon and assisted with Physeon's pre-submission preparations, which included authoring Veinplicity® for Improved Venous Access: The VIVA Trial Investigational Plan (the "Investigational Plan" or "Protocol").

47.    RCRI was responsible for authoring the Investigational Plan.  Specifically, Mary Kay Sobcinski took ownership over authoring and finalizing the Investigational Plan. As the author of the Investigational Plan, RCRI would provide drafts of the Investigational Plan to Physeon for review and input.

48.    Rachel Kennedy and Mary Kay Sobcinski (of RCRI) also participated in a telephone conference with members of the FDA to discuss Physeon's and RCRI's plan for the VIVA clinical trial.  This discussion with the FDA was done to confirm that the Investigational Plan, if successful, would support an application for marketing authorization in the United States.

49.     Based on these discussions and the FDA's comments, RCRI was aware that compliance with the Investigational Plan was of utmost importance both to Physeon and the FDA, and that the Investigational Plan, if successfully conducted and yielding favorable data on safety and effectiveness of the Veinplicity® device, would adequately support marketing authorization in United States.

50.     Mary Kay Sobcinski, as  the owner of the Investigational Plan, was also responsible for RCRI's Investigational Plan training, including at each of the three clinical sites.

51.     According to the VIVA Study's Investigational Plan and Work Order, RCRI would serve as the Study Management Center for the trial and would investigate clinical site qualifications prior to a clinic's recruitment into the study.  RCRI was also to provide site training to ensure investigational plan compliance as well as accurate data collection, and was to provide a study monitoring plan consistent with the applicable FDA regulations, the Protocol, HIPAA, the IRB rules, the informed consent, and RCRI's standard operating procedures.  *See* Investigational Plan, attached as Exhibit "2."

52.     As part of the monitoring plan, each study site was to undergo monitoring visits to be conducted by RCRI.  These visits, among other things, were to ensure the study site was conducting the study per Protocol, accurately recording data, completing the data forms in a timely manner, and complying with the Investigational Plan.  Additionally, RCRI was responsible for providing a qualified and trained site monitor.

53.     In addition to the Investigational Plan, RCRI and Physeon entered into a Statistical Analysis Plan ("Statistical Plan") on or about December 18, 2018.  The

Statistical Plan was authored by Jenna MacDonald, MS, of RCRI, who signed the Plan on RCRI's behalf.  Physeon also agreed to the Statistical Plan.

54.     The Statistical Plan was based on and included information specific to the Investigational Plan, and required RCRI to collect specific data endpoints.   Under the Statistical Plan, RCRI was to review, summarize and analyze the data endpoints as part of its final analysis.  RCRI was also required to provide Physeon with an interim, sample size re-estimation analysis that would determine whether the study would continue as originally designed or whether the total study sample size would be increased.

55.     Specifically, RCRI was to ensure that the clinical sites recorded and measured the total procedure time, the change in the vein quality score, and the time to first-stick vein access and success.  After the first-stick success rate of approximately the first 58 subjects enrolled in each group (control and Veinplicity®), RCRI was to complete an analysis to determine whether the VIVA Study at interim, *completed and carried out pursuant to the Investigational Plan*, had a conditional power that was favorable, promising, or sufficiently unfavorable that completion of the study might be reconsidered by Physeon.

56.     The FDA has explained the importance of interim analyses:

When trial data are examined in a comparative interim analysis, data analyses that were not prospectively planned as the basis for adaptations may unexpectedly appear to indicate that some specific design change (e.g., restricting analyses to some population subset, dropping a treatment arm, adjusting sample size, modifying the primary endpoint, or changing analysis methods) is ethically important or might increase the potential for a statistically significant final trial result. For example, unexpected lack of treatment adherence in one arm of a multiple-arm trial might motivate dropping that treatment arm.

16

*Adaptive Designs for Clinical Trials of Drugs and Biologics Guidance for Industry*,

U.S. Department of Health and Human Services, Food and Drug Administration

Center for Drug Evaluation and Research (CDER) Center for Biologics Evaluation

and Research (CBER),

November 2019 Biostatistics, at 23.

D.      <u>Key Requirements And Features Of The Clinical Trial Protocol</u>

57.     Pursuant to the Investigational Plan, the study sites and clinicians providing

treatment with Veinplicity® were required to make the first and, if necessary, the second

cannulation attempt "within 5 minutes of stimulation cessation" from the device.

58.     The Investigational Plan, therefore, required that the first and second

attempts to cannulate a patient's vein be completed within 5 minutes of cessation of

Veinplicity® stimulation on a patient's forearm.

59.     The Investigational Plan at page 18 further stated the parameters of the

administration of the device and the protocol for carrying out the clinical trial as:

> In summary, Veinplicity® stimulation is to be administered only once to each
> arm; however, both arms may be stimulated sequentially if necessary.
> Cannulation attempts in an arm **must be completed within 5 minutes of
> stimulation cessation in that arm**. An individual clinician can only make
> up to 2 total attempts at cannulation, and the subject can only have up to 4
> total attempts between both arms.

(emphasis added.)

60.     RCRI, and specifically Mary Kay Sobcinski, the owner of the Investigational

Plan, were well aware that all cannulation attempts in an arm were to be completed within

five minutes.   During a conference call with Physeon and RCRI to finalize the

Investigational Plan, the importance of the 5-minute time limit between the end of stimulation and end of cannulation was discussed in detail, with Mary Kay Sobcinski being very particular about this aspect of the Investigational Plan.  In fact, Mary Kay Sobcinski was adamant about including the five-minute cannulation requirement (hereinafter, "5-Minute Requirement") so there could be no misinterpretation about how the protocol was to be followed.  She and RCRI knew it was critical to the success of the VIVA Study.

61.     The Investigational Plan also required the completion of data forms, otherwise known as procedure worksheets or case report forms, for all subjects in the clinical trial.  For all trial subjects, the following data points were to be recorded:

> a)  Total procedure time, time from starting skin preparation for the control arm or time from electrode application for the treatment arm, to declaration of the study success/failure for the primary endpoint.

> b)  Time for tourniquet application after randomization to the time of vein access success/failure declaration from the primary endpoint.

And for the Veinplicity® subject group, the following data was to be collected:

> a)  Time the first Veinplicity® electrode is applied to the subject's arm to the time of vein access success declaration for the primary endpoint.

> b)  Time the Veinplicity® device turned on to the time it is turned off (stimulation duration). If Veinplicity® is switched from one arm to the other, mark the time from the second time it is turned on to the second time it is turned off.

> c)  Stimulation intensity (dial setting(s)); treatment group only.

62.     The Investigational Plan also set forth additional protocol requirements for the clinicians treating the patients enrolled in the VIVA Study.  To comply with the Investigational Plan, the clinician was to maintain stimulation intensity using Veinplicity®

in the Veinplicity® subject group for a minimum of 2 minutes and a maximum of 10 minutes, until the target vein became visible or palpable, before performing the cannulation.  First stick, or second stick, must be completed within five minutes.  This feature was critical to the principles underlying the regulations applicable to informed consent.  A Protocol is approved by an IRB based on the anticipated risks – which would include the duration of electrical stimulation – being outweighed by the potential benefits, including the greater first-stick success rate.  Patients who are undergoing the risk, even minimal risk, of device application with little or no, or reduced, likelihood of success consequent to delayed cannulation put the study's IRB approval at risk.  Maintaining Protocol compliance is integral to clinical research and an underlying basis for regulations and rules governing such research and, in part, the purpose of monitoring the clinical sites.

63.     According the Protocol, the sample size of the clinical trial was to be approximately 246 subjects and the trial was to be completed at up to five study sites in the United States.

64.     Ultimately, three study sites were selected to participate in the VIVA Study. The sites included the Mayo Clinic in Rochester, Minnesota; the Midwest Immunology and Infusion Center in Plymouth, Minnesota; and Regions Hospital in St. Paul, Minnesota.

65.     On July 3, 2019, after the first half of the patients had participated in the trial, RCRI sent a written notice to Physeon confirming that there was "no need to increase the sample size of the VIVA trial."  Physeon interpreted this notice to mean that the interim analysis had determined that the study had achieved "favorable" statistical significance in the first half of the trial, and so no increase in patient numbers was required prior to

4840-2023-4167

completion of the clinical study.  However, on July 12, 2019, RCRI provided Physeon with data upon on its request showing the first half of the trial had been determined to be "unfavorable" pursuant to the Statistical Plan.  Because RCRI informed Physeon that the study had failed, without discovering and/or disclosing that the unfavorable outcome was based on RCRI's own failure to follow the Investigational Plan, as well as other failures of RCRI in study performance and conduct, Physeon agreed to shut down the study and stop enrollment.

66.     Physeon's agreement and decision to shut down the study was solely based on the fact that RCRI advised Physeon that it was unlikely that the Study would prove successful should it be completed (including with an increased sample size).  Further patient enrollment in the VIVA Study was not needed because RCRI had deemed the study a failure, apparently based on its failure to monitor the study sites to ensure compliance with the Protocol and its failure to report non-compliance to Physeon, which then resulted in a flawed, interim statistical analysis.

67.     After being shown that the analysis was in error and the conduct of the VIVA Study flawed, Physeon asked RCRI to propose solutions to remedy RCRI's failure to meet its contractual obligations.

**E.     RCRI Failed To Properly Train and Monitor the Clinical Investigators, Failed to Ensure That The Clinical Trial Protocol Was Followed, and Failed to Collect Required Data And Failed To Report Shortcomings To Physeon**

68.     Pursuant to the Statistical Plan and Investigation Plan, RCRI provided an overview and interim, statistical analysis to Physeon after approximately 61 patients had

reached the data primary end point, measuring first-stick success, in the Veinplicity® subject group.

69.     Based on the analysis provided by RCRI, the Veinplicity® group had a first attempt success rate of 73% versus a control group (tourniquet only) success rate of 78%. These results, indicating that the VIVA Study was unfavorable, were unexpected, of great surprise to Physeon and significantly different from the results of the prior, published Netherlands Study of Veinplicity®.

70.     In Physeon's earlier trial in the Netherlands, the Veinplicity® treatment group had an overall first attempt success rate of 92% and the control (tourniquet) group had a 78% first attempt success rate.  Thus, as between the two studies, the control groups were identical at 78%, but the Veinplicity® success rate fell by 19% from the Netherlands Study to the VIVA Study.

71.     As a result of RCRI's interim, statistical analysis, Physeon asked RCRI to provide Physeon with information regarding its training and monitoring of the clinical investigators for the VIVA Study, compliance with the Investigational Plan, and collection and analysis of patient and study data and data on other endpoints.

72.     Among other things, and based on analysis of some of the initial data provided by RCRI and in follow-up thereto, Physeon asked RCRI to provide Physeon with procedure-related data on the length of the interval between the end of stimulation with Veinplicity® and end of the first-stick for the trial subjects, i.e., compliance with the 5-Minute Requirement.

73.     RCRI provided the requested data for the 61 patients enrolled in the clinical trial that were within the VIVA Veinplicity® group.  For one of the enrolled patients, there was no data available at all.  For another, the time to success was documented as negative three (3) minutes.  Of the remaining 59 patients, 16 patients (27% of patients enrolled in the Veinplicity® group) did not have the first-stick attempt completed within 5-minutes of cessation of use of Veinplicity® as required by the Investigational Plan.

74.     Perhaps more remarkably, six (6) patients did not have the first attempt even started within 5-minutes of cessation of use of Veinplicity® as required by the Investigational Plan.  In fact, the first cannulation attempt on four of these six patients took place 12 or more minutes after the completion of the application of Veinplicity®.  Not surprisingly, cannulation was not successful  in any of these four patients.

75.     A post-study sub-analysis performed by Physeon on the data provided by RCRI on July 19, 2019 showed, however, that when the 5-Minute Requirement in the Investigational Plan was followed by the study site, there was an 87% rate of success within the Veinplicity® subject group.

76.     The physiological effect of electrical stimulation following Veinplicity® application is time dependent, with veins returning to their baseline gradually after use.  The VIVA Study data showed a correlation between the delay attempt times and first-stick success rates – highlighting why the Protocol was clear as to the 5-Minute Requirement.  Again, RCRI was well aware of the 5-Minute Requirement and, in fact, was adamant that it be specifically included in the Investigational Plan.

77.     As discussed with RCRI before the VIVA study began, adherence to the 5-Minute Requirement in the Investigational Plan was critical to the VIVA Study's success and, of course, the very reason why the Requirement was in the Protocol in the first place. The 5-Minute Requirement was additionally required by the MSA and Work Orders, and RCRI was aware of its importance with respect to Physeon being able to provide reliable and documented efficacy and safety data to the FDA for marketing approval purposes.

78.     Post-study interviews with VIVA Study clinical sites by Physeon in the presence of RCRI personnel, including the investigator at Mayo Clinic, confirmed that RCRI largely failed to educate and train the study sites and their clinicians on the 5-Minute Requirement and that it was repeatedly violated.

79.     In fact, the Mayo Clinic informed Physeon and RCRI during a September 3, 2019, phone call that the RCRI Monitor for the VIVA Study was aware of non-compliance with the 5-Minute Requirement during the pendency of the VIVA Study, but had taken no corrective action at its study site.  RCRI also took no action to correct the non-compliance with the 5-Minute Requirement at the other two clinical sites.

80.     Indeed, when RCRI submitted its first interim monitoring report for the Mayo Clinic site, the site monitor reported that "[s]tudy procedures [had been] performed/documented as required" and no "protocol deviations" had been found. Ultimately, neither of those statements was accurate.

81.     Because the VIVA Study was unblinded, RCRI's monitoring plan should have immediately discovered the high incidence of protocol non-compliance and the impact of non-compliance with the Investigational Plan on the study's results.  In fact, the

very first patient randomized to the Veinplicity® arm of the study (patient number 01-003), had delayed first-stick in violation of the 5-Minute Requirement.  The patient's first attempt took 8.5 minutes after cessation of stimulation with Veinplicity® and the second attempt 10 minutes after cessation of stimulation.

82.     RCRI's monitoring of the VIVA Study sites and the clinical trial also should have identified the study sites' failure to properly and timely record time entries on the data forms as required by the Investigational Plan.  While RCRI obtained authorization to purchase better timing equipment for the study sites and clinicians – because RCRI claimed study conduct warranted the additional expense to ensure study documentation – RCRI apparently never reviewed data forms nor took any steps to correct this non-compliance.

83.     Had RCRI reviewed the data forms, the study sites' non-compliance with both entering data and in complying with the 5-Minute Requirement as clearly set forth in the Investigational Plan would have been obvious.  The failure to do so was in breach of the MSA, Work Order and the Investigational Plan as well as state, institutional and federal regulations governing clinical trials – to which RCRI had committed to adhere in those self-same documents.

84.     As a self-proclaimed "leading clinical research organization," RCRI should have known that its failure to ensure the Investigational Plan was followed would result in unreliable and unusable results, no matter the outcome, and Physeon being left with unusable data with respect to future FDA submissions.  Indeed, FDA audits clinical sites for study protocol compliance before accepting any data for review, and data collected in

abeyance of such compliance is deemed invalid by FDA regardless of the success or failure of the study.

85.    RCRI also should have known that the interim analysis should account for instances where the Investigational Plan was not followed, which apparently was commonplace during the VIVA Study as monitored by RCRI.  Aside from the ethical impropriety of enrolling and treating patients outside the Protocol parameters, patients in whom the physiological effect has functionally dissipated should not be included in an interim assessment designed solely to consider whether the device is likely to work as a predicate to Physeon's decision of whether to finish the study.

86.    Had RCRI identified in the interim analysis the lack of Protocol adherence, it is probable that it could have adjusted the study such that the findings of the study as a whole would have reached statistical significance, rather than dooming Veinplicity®'s promising future.

87.    As a result of RCRI's failure to properly train the VIVA Study clinical sites and its investigators and clinicians, failure to properly manage and monitor the clinical trial of the Veinplicity® device, and failure to properly manage and analyze the clinical data, Physeon's VIVA Study was fundamentally undermined and rendered worthless.

88.    In addition, RCRI's failure to properly analyze the data and provide Physeon with complete and accurate case report forms and interim statistical analysis resulted in RCRI prematurely, and wrongfully, declaring the VIVA Study a failure.  Based on RCRI prematurely declaring the VIVA Study a failure, the VIVA Study was prematurely closed to the harm of Physeon.

F.    **Harm To Physeon And The Veinplicity® Device**

89.    Physeon was unaware of the irregularities that were occurring during the course of the VIVA Study.  RCRI did not provide information with regard to its breaches of the MSA and the Work Order, or RCRI's failure to follow the Investigational Plan. Because the interim analysis included patients treated outside the bounds of the Investigational Plan, without identifying the fact that those patients were treated outside the Protocol, the conclusions drawn from the interim analysis were flawed.

90.    Because of RCRI's breaches and other wrongdoings, the data acquired from the VIVA Study cannot be used reliably or for the intended purpose, which was to provide reliable data on the safety and efficacy of Veinplicity® in relation to the end points of the clinical trial for the purposes of submission to relevant regulatory authorities, namely the FDA.  Further, had the study been performed in compliance with the Protocol, the available data would result in a conclusion that the Veinplicity® device was safe and effective and Physeon would have had RCRI complete the study.  But, based on RCRI's breaches and wrongdoings as described above, that outcome is no longer possible.

91.    The numerous violations of the Investigation and failure to properly monitor and oversee the clinical trial – in violation of the MSA and Work Order, as well as RCRI's own guidelines and standards, and applicable FDA regulations – have caused the results of the VIVA Study to be of no value.  Attempts to use the flawed data to seek marketing authorization in the U.S. from the FDA would be futile.

92.    Physeon has therefore suffered damages, including but not limited to the money paid by Physeon to RCRI to conduct the VIVA Study.

## COUNT I: BREACH OF CONTRACT

93.     Physeon restates and re-alleges the allegations within the foregoing paragraphs as though set forth fully herein.

94.     Physeon entered into the MSA with RCRI wherein RCRI agreed to conduct the VIVA Study in accordance with the Work Order, which required RCRI to ensure the Investigational Plan was followed by the study sites and its clinicians through site training, management, and monitoring, including a detailed review of the Investigational Plan.  It also required Investigational Plan compliance.

95.     The MSA is a valid and enforceable written contract.

96.     Physeon performed all conditions precedent under the MSA, and made payments totaling 473,702.05 to RCRI.

97.     RCRI breached the MSA by failing to provide the site training, management and study site monitoring necessary to ensure the Investigational Plan was followed in the VIVA Study.

98.     Specifically, RCRI failed, among other things, to ensure the study sites followed the 5-Minute Requirement as mandated in the Investigational Plan.  This resulted in unreliable data, including with respect to vein quality scores.

99.     RCRI failed to confirm that the study sites were accurately or thoroughly completing the case report forms and other VIVA Study documents.

100.    RCRI's failures included, but are not limited to, the following:

a)  Not providing adequate site training to ensure Investigational Plan compliance, including the full and accurate collection of data;

b) Not implementing a study monitoring plan and quality systems that were both consistent with the applicable FDA regulations and RCRI's standard operating procedures, which would have identified and corrected the Investigational Plan non-compliance.

101.    As a result of RCRI's breaches of the MSA and Work Order, the VIVA Study was not conducted according to the Investigational Plan as agreed to by Physeon and RCRI, which both parties understood was critical to success of the clinical trial and the FDA's acceptance of the trial's data on safety and efficacy for Veinplicity® and for marketing approval in the United States.

102.    As a direct and proximate result of RCRI's breaches of the contract, Physeon has been damaged and seeks recovery from RCRI of all amounts paid to RCRI under the MSA and Work Order.

103.    Pursuant Section 12.4 of the MSA, the prevailing party in this action shall be awarded costs and fees, including reasonable attorneys' fees.

104.    As a direct and proximate result of RCRI's breaches, Physeon has suffered and will continue to suffer damages.

## <u>COUNT II – UNJUST ENRICHMENT</u>

105.    Physeon restates and re-alleges the allegations within the foregoing paragraphs as though set forth fully herein.

106.    Physeon conferred a benefit on RCRI by, among other things, entering into the MSA and making payments to RCRI.

107.    RCRI has knowingly accepted the benefit of payments from Physeon for the services provided under the MSA.

4840-2023-4167

108.    It is unjust and inequitable for RCRI to accept and retain this benefit because it failed to provide to Physeon the contracted-for services.

109.    Physeon has been damaged and seeks recovery of all amounts paid to RCRI under the MSA, and in an amount to be proven at trial.

**WHEREFORE**,   Plaintiff respectfully asks that the Court enter judgment as follows:

1.    Awarding judgment in favor of Plaintiff and against Defendant Covance Inc. in an amount of 473,702.05, plus interest, attorneys' fees, costs, and disbursements, the exact amount to be determined at trial; and

2.    Awarding Plaintiff such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  March 20, 2020              By___s/Amanda M. Cialkowski_____
                                    Amanda M. Cialkowski      Reg. No. 306514
                                    David J. Warden           Reg. No. 393474
                                    **Attorneys for Plaintiff Physeon GmbH**
                                    NILAN JOHNSON LEWIS PA
                                    250 Marquette Avenue South, Suite 800
                                    Minneapolis, MN  55401
                                    Telephone:  612-305-7500
                                    Facsimile:  612-305-7501
                                    Email:     acialkowski@nilanjohnson.com
                                               dwarden@nilanjohnson.com

4840-2023-4167